# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 23, 2011

No. 09-30075

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ELDRIDGE SIMPSON, also known as Woozy,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, ELROD, and HAYNES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Eldridge Simpson was indicted for various federal crimes, including, *inter alia*, conspiracy to traffic in narcotics, membership in a criminal enterprise, murder and attempted murder. Simpson was provided two court-appointed lawyers, Sheila Myers and Julian Murray, but he persistently refused to cooperate with them. They argued that this behavior demonstrated that he was incompetent. The district court, after hearing the testimony of several doctors at five competency hearings, held that Simpson was competent.

No. 09-30075

Simpson twice requested the appointment of substitute counsel. The district court refused to appoint substitute counsel or to allow Myers and Murray to withdraw, but the district court did appoint Michael Ciaccio as liaison counsel to help Simpson communicate with Myers and Murray.

Other facts relevant to this appeal include that Simpson's co-defendant Terrance Benjamin was facing the death penalty. After a death-qualified jury had been selected, Benjamin pleaded guilty. Simpson moved to strike the jury, arguing that because he was a non-capital defendant being tried alone, he could not be tried by the death-qualified jury. The district court denied his motion, the case proceeded to trial, and the jury convicted Simpson on all counts. The district court sentenced Simpson to life imprisonment.

On appeal, Simpson urges us to overturn his conviction, and says that there are three reasons that we should do so. First, he contends that he was not competent to stand trial. Second, he argues that his Sixth Amendment right to effective representation was violated. Third, he argues that he was entitled to a new round of jury selection after Benjamin pleaded guilty. We find no reversible error, and we AFFIRM.

I.

On August 10, 2003, Eldridge Simpson was indicted for committing various crimes, including, *inter alia*, conspiracy to traffic in narcotics, membership in a criminal enterprise, attempted murder, and murder.[1] On September 16, Myers and Murray were appointed to defend Simpson, and after being replaced for a brief period, they were reappointed on October 16.[2] Myers

---

[1] After several of Simpson's co-defendants pleaded guilty, the government filed a superseding indictment on June 25, 2004. The charges against Simpson remained the same.

[2] In the interim, Simpson was represented by Raymond McGuire; McGuire had been retained by Simpson's family.

and Murray repeatedly asked the trial court to declare Simpson incompetent, and, in affidavits, described Simpson's erratic behavior.[3]

On March 10, 2005, the trial court held the first of five competency hearings.[4] Dr. Richard Richoux testified that Simpson was unable to assist in his defense because he had a paranoid distrust of Myers and Murray. Richoux conceded, however, that Simpson understood the differing responsibilities of the various players, i.e., the court, the prosecutors, and Myers and Murray. Simpson refused to cooperate with the government's expert, Rennie Culver, but Culver testified, based on a review of Simpson's file, that Simpson was not mentally ill. The trial court did not conclude the hearing, so that it later could receive Simpson's correctional facility medical records. The hearing resumed on March 14 with testimony from Dr. Michael Higgins. Higgins testified that Simpson did not need medication, was not suicidal, and was not paranoid. The trial court initially found that Simpson was competent, but, on April 27, granted a motion to reconsider and ordered a new competency exam, which was performed by Dr. Jim Womack at the Federal Medical Center in Fort Worth, Texas.

Womack, in a written report, indicated that Simpson was not mentally ill, but he acknowledged that his diagnosis was tempered by information that had been provided by Myers and Murray and by Simpson's family. Womack testified in conformity with his report at the second competency hearing, which was held on July 28. The trial court determined that Simpson was incompetent, and Simpson was sent to the Federal Medical Center in Butner, North Carolina for

---

[3] The affidavits report, *inter alia*, that Simpson refused to accept copies of discovery documents; insisted, in face to face meetings, upon communicating in writing; accused Myers of breaching confidentiality; rejected Myers's report that the government had proposed a plea bargain; and accused Myers of working with the government. The affidavits further report that this conduct occurred because Simpson feared that other prisoners, believing him to be a snitch, were eavesdropping on his attorney-client meetings.

[4] On November 17, 2004, and January 15, 2005, Simpson had been placed on suicide watch.

No. 09-30075

treatment.   In February 2006, the Butner staff reported that Simpson was competent; Simpson stipulated to this report.  At a third competency hearing, held on April 19, the trial court, relying on this report, determined that Simpson was competent.

In April 2008, Simpson made a second request[5] for the appointment of substitute counsel, arguing that Myers and Murray were ineffective because they had been unable to have him transferred from St. Charles Jail to St. Tammany Jail; Simpson had been held at St. Tammany prior to his treatment at Butner.  On April 16, the trial court denied Simpson's motion, reasoning that Myers and Murray were experienced trial attorneys who had provided adequate representation.  For some indeterminate period thereafter, Simpson did not communicate with Myers and Murray.  On June 6, Myers and Murray filed a motion to withdraw, explaining that they were unable to represent Simpson because he would not communicate with them.  The district court denied the motion, concluding that Simpson was voluntarily refusing to cooperate.  On June 16, Myers and Murray renewed the motion, and it was again denied.

On June 9, the trial court held a fourth competency hearing.  Dr. Harold Ginzburg testified that Simpson was paranoid, but said that Simpson's paranoia applied only with respect to Myers and Murray.  Ginzburg said that he could not tell whether Simpson was malingering because Simpson was not properly medicated.  Ginzburg also noted that Simpson indicated a willingness to work with any lawyer other than Myers or Murray.  Dr. Culver examined Simpson and again testified that Simpson was not mentally ill; he further said that Simpson was capable of communicating with his attorneys but was refusing to do so.  The district court again held that Simpson was competent to stand trial.

---

[5] On April 27, 2005, Simpson had orally requested the appointment of substitute counsel.  The trial court denied the motion, but told Simpson that he could renew the motion after Womack issued his report.  Simpson did not do so.

Voir dire began, and because the government was seeking the death penalty against Simpson's co-defendant Terrance Benjamin, jurors were removed for cause if they indicated an inability or absolute unwillingness to administer the death penalty. Jurors were also removed for cause if they indicated an inability or absolute unwillingness to choose life imprisonment as an alternative to death. On June 20, after the jury had been selected, Benjamin pleaded guilty, and Simpson moved to strike the jury, arguing that, because he was a non-capital defendant who would now be tried alone, he could not be tried by the death-qualified jury. The district court denied Simpson's motion.

On June 23, the court, prompted by nonsensical notes that Simpson had written during voir dire, held a fifth competency hearing. Dr. John Thompson was appointed by mutual consent of the parties; he testified that although Simpson exhibited some symptoms of paranoia, he was not mentally ill. The court determined, for the fourth time, that Simpson was competent.

On June 28, the court entered an order appointing Michael Ciaccio to serve as liaison counsel. Ciaccio met with Simpson, who said that he had lost faith in Myers and Murray because they repeatedly had called his mental health into question. Simpson also told Ciaccio that he did not believe that any unpaid lawyer would provide his best efforts. Immediately before trial, Murray informed the district court that Ciaccio had spoken with Simpson; Murray sought permission to put the contents of this conversation on the record. Honoring this request, the district court, following the first day of trial, allowed Ciaccio to make his report; after hearing the report, the court discharged Ciaccio.

The jury proceeded to convict Simpson on all counts and the court sentenced him to life imprisonment. Simpson appeals, arguing that he was not competent to stand trial; that his Sixth Amendment right to effective representation was violated; and that he was entitled to have a new jury selected

No. 09-30075

following Benjamin's guilty plea. We cannot agree with any of his arguments and thus affirm his conviction.

## II.

## A.

Simpson first argues that his conviction must be overturned because he was not competent to stand trial. We engage in "a species of clear error" when reviewing a trial court's competency determination, and, after "re-analyz[ing] the facts and tak[ing] a hard look at the trial judge's ultimate conclusion[,]" we will reverse only if the finding was "clearly arbitrary or unwarranted." *United States v. Joseph*, 333 F.3d 587, 589 (5th Cir. 2003) (internal quotation marks and citation omitted).

To be deemed competent, the defendant must have "the present ability to consult with his lawyer with a reasonable degree of rational understanding and ha[ve] a rational as well as factual understanding of the proceeding[ ] against him." *Id.* A district court can consider several factors in evaluating competency, including, but not limited to, its own observations of the defendant's demeanor and behavior; medical testimony; and the observations of other individuals that have interacted with the defendant. *Id.* A defendant who has it "within his voluntary control to . . . cooperat[e]," is not incompetent merely because he refuses to cooperate. *Id.*

Simpson notes that Myers and Murray repeatedly apprised the court of his inability to communicate, and he says that this inability rendered him incompetent to stand trial. Simpson also contends that Drs. Richoux and Ginzburg diagnosed him with paranoia. The government counters that Simpson was able, but unwilling, to consult with Myers and Murray. The government further argues that the medical testimony, on balance, demonstrates that Simpson was not mentally ill, and the government emphasizes that the Federal Medical Center at Butner discharged Simpson with a clean bill of health.

6

No. 09-30075

It is our not our task, as an appellate court, to relitigate the battle of the experts. Our task is instead to take a "hard look" at the facts to determine whether the district court's competency finding was "clearly arbitrary or unwarranted." *Id.* The record demonstrates that the trial court proceeded with utmost caution. It held five competency hearings and had Simpson evaluated at two Federal Medical Centers. At least four doctors -- Drs. Culver, Higgins, Womack and Thompson -- testified that Simpson was not mentally ill, and the Federal Medical Center at Butner agreed with their conclusion. Finally, Simpson admitted that he would cooperate with any lawyer other than Myers or Murray, thereby suggesting that his refusal to communicate was voluntary.

We acknowledge that there is some evidence that suggests that Simpson was suffering from a mental condition. At times, he behaved irrationally and Drs. Richoux and Ginzburg testified that he was paranoid. The record also reveals, however, a great deal of evidence to support a finding that Simpson was purposefully engaging in manipulative conduct. Simpson had, throughout his criminal career, demonstrated a flagrant disregard for the mores of organized society, and the trial court had good grounds to suspect that Simpson was exaggerating his symptoms to avoid the ultimate consequences of his behavior. In any event, although Simpson had some symptoms of paranoia, he was competent because he was able to "consult with" Myers and Murray "with a reasonable degree of rational understanding" and was able to understand the proceeding. *Id.*

Faced with Simpson's limited and suspicious symptoms, the district court determined that Simpson was simply refusing to do that which he was volitionally capable of doing, that is, he was purposefully refusing to communicate with Myers and Murray. Based on the diligent attention it gave to Simpson's "condition" in five separate hearings, the district court was able to rely on a wealth of information in reaching this conclusion. Indeed, we think it

No. 09-30075

particularly pertinent that Dr. Thompson testified, on the eve of trial, that Simpson was competent. *See Martin v. Estelle*, 583 F.2d 1373, 1374 (5th Cir. 1978) ("Medical evidence, such as expert testimony from psychiatrists who have examined the defendant near the time of trial . . . generally provide[s] sound material for reconstruction of defendant's mental state.")  The district court's competency finding was neither arbitrary nor unwarranted, and we therefore leave it undisturbed.  *Joseph*, 333 F.3d at 589.

B.

Simpson next argues that he was denied the Sixth Amendment right to effective representation.  In order to succeed on an ineffective assistance claim, Simpson must establish that his counsel's performance was deficient, and that this deficiency prejudiced him.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Simpson argues that the representation that he was provided was constitutionally defective for three independent reasons.  First, he says that because he and his lawyers had a complete breakdown in communication, he was entitled to have substitute counsel appointed.  Second, he argues that because the nature of Michael Ciaccio's appointment as liaison counsel was unclear, especially to him, he was deprived of his right to an unambiguous appointment of counsel.  Third, he contends that he was denied the right to conflict-free representation because Ciaccio was attempting to serve two masters in his role as liaison counsel. Except as otherwise noted, we will review these claims *de novo.   United States v. Infante*, 404 F.3d 376, 391 (5th Cir. 2005) (Sixth Amendment claims are subject to *de novo* review).

1.

Although we review Sixth Amendment claims *de novo*, *id.,* if that Amendment has not been violated, the trial court's refusal to appoint substitute counsel is reviewed for an abuse of discretion.  *United States v. Young*, 482 F.2d

No. 09-30075

993, 995 (5th Cir. 1973). We have previously stated that substitute counsel should be appointed only for "good cause," which includes a "complete breakdown in communication[.]" *Id*. We will assume that a complete communication breakdown occurred here. It is not disputed that, for whatever reason, Simpson refused to communicate with his attorneys. The question, then, is whether Simpson's refusal to communicate with Myers and Murray requires us to reverse his conviction.

In *Young* the question was whether a defendant's "distrust of his appointed counsel made effective representation . . . impossible." *Id*. at 996. We affirmed the trial court's refual to appoint substitute counsel but, in so doing, we noted that there was "[n]o contention . . . that [the defendant] refused to consult with" his lawyer. *Id*. Although this language may seem to imply that a defendant's refusal to communicate requires the appointment of substitute counsel, *Young* did not reach that conclusion; as suggested by the operative language itself, that issue was not before the court. *See id*.

Simpson refers us to other circuits for support of his position. Those circuits have found complete communication breakdowns where a defendant's repeated efforts failed to establish contact with his attorney, *United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir. 2002), and where the attorney had no communication with the defendant in the month preceding trial. *United States v. Mullen*, 32 F.3d 891, 896-97 (4th Cir. 1994).

Simpson argues that *Lott* and *Mullen* demonstrate that a defendant who is unable to communicate with his lawyer is entitled to the appointment of substitute counsel; thus reversal is appropriate here because his paranoia made it impossible for him to communicate with Myers and Murray. The government responds that both cases are distinguishable; it argues that reversal is inappropriate when the breakdown can be attributed to the defendant's intransigence, and not to the neglect of defense counsel or the trial court.

We agree with the government's view of these cases. In *Lott*, the defendant's attorney did not respond to the defendant's letters and seemed to ignore the defendant altogether. 310 F.3d at 1237-38. Here, the facts are markedly different: Myers and Murray repeatedly tried to communicate with Simpson only to be stonewalled, and Simpson has not intimated that either Myers or Murray failed to respond to any of his inquiries. In *Mullen* the defendant requested that the lawyer hired by her family be replaced with appointed counsel, but on the day of trial she was required to choose between either proceeding pro se or with the retained lawyer. 32 F.3d at 894. She "reluctantly" chose to proceed pro se, and she "presented no evidence, and made no closing argument." *Id.* at 894-95. Again, the facts in *Mullen* bear scant, if any, resemblance to the facts of the case today. Here, Raymond McGuire, the retained lawyer, was actually *replaced* in the early stages of the proceedings. Simpson was never required to proceed pro se. Myers and Murray offered him continuing availability of able advocacy that he continually refused to accept.

As Simpson acknowledges, the breakdown of attorney-client communications is intertwined with the competency issue. Simpson was the root cause of the communication problem. Because he was adjudged competent, it is reasonable to conclude that he was capable of cooperating with his lawyers, and was only engaging in a ruse, at least in part, to "demand a different appointed lawyer." *Young*, 482 F.2d at 995. We cannot find "good cause" to appoint substitute counsel where none exists. *See id.* Simpson admitted that he was willing to cooperate with any lawyer other than Myers or Murray. Under the facts before us, neither the Sixth Amendment nor our precedent suggests that Simpson was entitled to the appointment of substitute counsel.[6]

---

[6] We recognize that the Ninth Circuit has held that "to compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of . . . effective assistance." *Brown v.*

No. 09-30075

2.

We now turn to Simpson's argument that Ciaccio's appointment violated his right to a "clear and unambiguous" appointment of counsel.  The Supreme Court long ago held that the Sixth Amendment is violated if the "designation of counsel . . . [is] so indefinite . . . as to amount to a denial of effective and substantial aid . . ." *Powell v. Alabama*, 287 U.S. 45, 53 (1932).[7]  Applying this standard, the Court found constitutional infirmity in the trial court's decision to wait until the day of trial to appoint trial counsel, noting that, although the entire bar had, without any further specification, previously been appointed to represent the defendants, the individual members of the bar "would not, thus collectively named, have been given that clear appreciation of responsibility or impressed with that individual sense of duty which should and naturally would" result from a proper appointment.  *Id.* at 56.  Simpson argues that because Ciaccio's appointment occurred almost immediately before trial, it resembles the last-ditch appointment in *Powell*.

As we have earlier said, during the weekend immediately preceding trial the district court appointed Michael Ciaccio to act as liaison counsel, i.e., to facilitate Simpson's communications with his primary lawyers, Shelia Myers and

---

*Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970).  The error in *Brown*, however, was that the trial court "did not . . . take the necessary time and conduct such necessary inquiry as might have eased Brown's [that is, the defendant's] dissatisfaction, distrust, and concern."  *See id.*  The point, in other words, is that the district court must at least consider whether a defendant's concern with his lawyer is justified.  Here, as we have said, the district court paid close attention to the supposed source of Simpson's communication barrier, holding repeated hearings to determine whether Simpson was capable of communicating with Myers and Murray.

[7] Although Simpson cites to cases other than *Powell*, those cases merely reaffirm the principle iterated in *Powell*, i.e., it is error if a trial court waits until the eleventh hour to appoint counsel.  *See, e.g.*, *United States ex rel. Washington v. Maroney*, 428 F.2d 10, 13-14 (3d Cir. 1970).

Julian Murray.[8]  He complains, however, that the trial court did not adequately explain Ciaccio's role, thereby confusing him and undermining his already rocky relationship with Myers and Murray.  He thus contends that Ciaccio's appointment was like the appointment in *Powell*, "indefinite."  The government responds that *Powell* is inapposite, as Myers and Murray represented Simpson for over six years;  unlike the *Powell* defendants, he was not left in the lurch. *See id.*

We think the government is correct.  Ciaccio's appointment does not resemble the appointment in *Powell*.  Simpson was indicted in August 2003, and Myers and Murray were appointed in September 2003.  Thereafter, with one brief period of interruption, Myers and Murray represented Simpson for more than five years.  Thus, although Ciaccio was appointed on the eve of trial, Simpson was long represented by two attorneys; in contrast, none of the *Powell* defendants were represented in any concrete sense until the day of trial.  *See* 287 U.S. at 53.  Furthermore, the district court made Ciaccio's role plain, explaining that he was appointed solely to facilitate communication, and not to try the case. We hold that Ciaccio's appointment was not ambiguous or indefinite.

3.

Simpson further argues that Ciaccio was hampered by a conflict of interest, and therefore was unable to provide effective representation. We turn now to address that argument.  The Supreme Court has held that a lawyer's conflict of interest may be so flagrant as to constitute a violation of the Sixth

---

[8] By way of background, the district court appointed Ciaccio in response to the repeated concerns voiced by Myers and Murray relating to Simpson's refusal to communicate with them. Thus, although the district court refused to replace Myers and Murray, it did not ignore their concerns regarding communication; it appointed Ciaccio precisely to address these concerns. Ciaccio was appointed late on the Friday night immediately preceding trial, i.e., on June 27. The order appointing Ciaccio provided that he was to begin serving as liaison counsel on June 28. The order further provided that Ciaccio was appointed "to serve as liaison counsel between Eldridge Simpson and his counsel." The trial began on June 30.

Amendment. *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978). In *Holloway* the Court reversed the conviction because the trial court failed properly to consider an objection to a conflict inherent in the joint representation of two defendants who had divergent interests. Faced with this glaring error, the Court saw no need to determine "how strong a showing of conflict" must be made to compel reversal of a conviction. *Id.* at 483-84.

The Court has subsequently clarified that "a reviewing court cannot presume that the *possibility* for conflict has resulted in ineffective assistance of counsel" unless the trial court refuses to grant "a defendant who objects to multiple representation . . . the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)(emphasis added). Prejudice is nonetheless presumed, even absent a timely objection, if the defendant shows on appeal "that an actual conflict of interest adversely affected his lawyer's performance." *Id.* Simpson did not object to Ciaccio's appointment and our analysis is therefore two-fold. We first ask whether Ciaccio was conflicted. If our answer is affirmative, then we will address whether the conflict actually affected Ciaccio's performance.

Simpson's argument appears to be that Ciaccio was simultaneously representing two "clients": the court and Simpson. Simpson acknowledges that Ciaccio was *ostensibly* appointed to serve as liaison counsel, but he argues that Ciaccio was *actually* appointed to serve as a court-appointed investigator. He bases this argument on two separate events. First, he notes that the trial court said that Ciaccio would not be responsible for "any actions taken during the course of the trial." Second, Simpson points out that Ciaccio was advising -- and thus, the argument goes, representing -- the trial court when he reported that Simpson was willing to work with any lawyer other than Myers or Murray.

With respect to Simpson's first point: Although the trial court stated that Ciaccio would not be responsible for actions taken during the course of trial, this

statement merely clarified Ciaccio's role as liaison counsel, i.e., it made clear that Ciaccio was appointed not to try the case but to help Simpson communicate with Myers and Murray.

We now turn to the second point, but before addressing Simpson's complaint about the trial court's questioning of Ciaccio, it may be helpful to once again set out the pertinent facts. As we have said, Ciaccio began his role as liaison counsel on Saturday, June 28, and met with Simpson twice over the course of the weekend. Simpson's trial began on June 30. Immediately before the jury was seated, the trial court noted its understanding "that Simpson's attorneys wanted to address the court before the jury came in." In response, Julian Murray -- who was Simpson's lawyer -- said: "[W]e do have Mr. Ciaccio in court. He did go and speak with Mr. Simpson [on] two different occasions over the weekend. We would like to make a note of [the] evidence as to what took place in that regard, whenever it is convenient to the court . . . ." Murray also said that "we won't try to take up the court's time [with this] now[,]" (presumably because the proceedings were already behind schedule due to a delay in transporting Simpson to the courtroom). Then, after the jury had been excused for the day, the district court promptly revisited the matter, reminding Murray that the defense had previously indicated that it "wanted to make a note of record concerning the second lawyer that we appointed to try to assist you all with communicating with Mr. Simpson." Murray confirmed that the defense still wanted to make this report. Thus, the record clearly shows that the trial court's questioning about which Simpson complains took place only after Simpson's lawyers requested it. Moreover, the district court emphasized that Ciaccio should not discuss "any details of [Simpson's] defense." Ciaccio reported that Simpson had indicated a willingness to cooperate with any lawyers other than Myers and Murray. The trial court then dismissed Ciaccio, presumably

14

because it determined that responsibility for any communication problems lay with Simpson.

We are convinced that Ciaccio was not hampered by any conflict of interest. Although the trial court strictly limited the role of Ciaccio's appointment, this limitation was reasonable because Simpson was already represented by two capable attorneys. Moreover, the district court questioned Ciaccio only after being requested to do so by Julian Murray, Simpson's attorney. The trial court did not err in appointing Michael Ciaccio.

C.

Finally, Simpson argues that his constitutional rights were violated when the trial court refused to strike the death-qualified jury after Terrance Benjamin pleaded guilty. As we have earlier set out, Simpson was initially a co-defendant of Benjamin, against whom the government sought the death penalty. Benjamin pleaded guilty after the jury had been selected, leaving Simpson to be tried by a death-qualified jury. In reviewing a district court's denial of a motion to strike a jury venire, this court reviews factual findings for clear error and conclusions of law de novo. *United States v. Alix*, 86 F.3d 429, 434 (5th Cir. 1996). We will assume that we should apply this standard to the slightly different situation here, where Simpson moved to strike a jury that had already been selected.[9]

Simpson argues that, except in limited circumstances not present here, the death-qualification process violates the Fifth and Sixth Amendments. He further urges that death-qualified juries are constitutionally infirm because they are not drawn from a fair cross-section of the community and are not impartial. Finally, he urges us to hold that a death-qualified jury can serve only if one or more defendants face the death penalty at the time the jury is sworn.

---

[9] Although it seems arguable to us that the trial court should be granted additional deference when it decides whether to strike a jury that has already been selected, the parties have not briefed this issue, and we decline to decide it *sua sponte*.

"The Sixth Amendment and the Due Process Clause of the Fifth Amendment require that a jury be drawn from a fair cross-section of the community." *United States v. Williams*, 264 F.3d 561, 567 (5th Cir. 2001) (internal quotation marks and citation omitted). Similarly, the Sixth Amendment entitles criminal defendants to an impartial jury, but "[t]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Lockhart v. McCree*, 476 U.S. 162, 184 (1986). "To establish a prima facie violation" of the fair cross-section requirement, a defendant must show among other matters, "that the group alleged to be excluded is a distinctive group in the community." *Williams*, 264 F.3d at 568 (internal quotation marks and citation omitted). Death penalty opponents are not a "distinctive group," and "death qualification does not violate the fair-cross-section requirement." *See Lockhart*, 476 U.S. at 177 (internal marks omitted); *see also Kelly v. Lynaugh,* 862 F.2d 1126, 1135 (5th Cir. 1988)(same).[10]

Simpson argues, however, that the foregoing precedent does not directly answer the question before us; indeed, he says that this is a question of first impression. He acknowledges that the Supreme Court has held that the use of a death-qualified jury in the joint trial of a capital and non-capital defendant does not violate the fair cross-section requirement or the impartiality requirement. *Buchanan v. Kentucky*, 483 U.S. 402, 416-20 (1987). He argues,

---

[10] Simpson insists that a disproportionate number of women and racial minorities are removed during the death-qualification process. We need not decide whether he is correct, because the fair cross section requirement is not violated when jurors are removed because of their death penalty views, regardless of their ethnicity or gender. *See Lockhart*, 476 U.S. at 175-76 (distinguishing the removal of jurors based on "immutable characteristics" from the removal of jurors based upon "attribute[s] . . . within the individual's control.").

16

however, that *Buchanan*'s reasoning -- that there is a significant governmental interest in judicial efficiency, which is furthered by presenting the same evidence to one jury instead of two juries -- is inapposite here, because selecting a new jury would have caused only a slight delay. *See id.* He contends that, absent a significant interest, the government cannot try a non-capital defendant before a death-qualified jury. Finally, Simpson insists that *no* court has ever held that a non-capital defendant being tried alone can be tried by a death-qualified jury. He presses us to establish a bright-line rule: that death-qualified juries can serve only if one or more defendants face the death penalty at the time the jury is sworn. *See United States v. Causey*, 185 F.3d 407, 430 (5th Cir. 1999) (DeMoss, J., concurring in part and dissenting in part) ("Surely if a noncapital defendant were being tried separately, the government could not exclude jurors for cause on the grounds of their opposition to the death penalty . . . .")

In response, the government first notes *Lockhart*'s holding that death-qualification does not violate the fair cross section requirement. 476 U.S. at 177. The government also argues that this court presumes "that jurors understand and follow their instructions," and that we abandon this presumption only if "there is an overwhelming probability that the jury will be unable to follow the instruction[s] and there is a strong possibility that the effect is devastating." *United States v. Patino-Prado*, 533 F.3d 304, 313 (5th Cir. 2008) (internal quotation marks and citation omitted).

We again emphasize that at the time Simpson's jury was death-qualified, Simpson was slated to be tried along with a capital defendant, Terrance Benjamin. Although Simpson relies heavily on *Buchanan, Buchanan* makes clear that when two defendants -- one capital, the other non-capital -- are being tried together, death-qualification is permissible. 483 U.S. at 416. The Court reasoned that in a capital case the exclusion of jurors that would refuse to administer the death penalty "is related to the . . . legitimate interest in

17

obtaining a jury that does not contain members who are unable to follow the law . . . ." *Id.* Thus, *Buchanan* ratified the initial process that took place here. The question, then, is whether Benjamin's guilty plea changes the analysis such that we should establish a new categorical rule.[11] To answer that question, we return to two well-established rules of law that we have discussed above.

First, courts have repeatedly held that death-qualified juries do not violate the fair cross-section requirement and, given the foregoing, we decline to create an exception to that rule now. *See, e.g., Lockhart*, 476 U.S. at 177. Second, we presume, absent evidence to the contrary, that jurors will follow their instructions. *Patino-Prado*, 533 F.3d at 313. Simpson does not argue that the jurors were improperly instructed, and he has failed to introduce any compelling evidence to defeat the presumption that the instructions were followed; he instead relies on studies of a genre that has been rejected by the courts, that is, studies that show that death-qualified juries are somehow tainted with a fixed, pro-conviction, mindset. *See Lockhart*, 476 U.S. at 171-73. If we momentarily assume that jurors who favor the death penalty are, by nature, more favorable to the government, it seems to us that logical consistency would require us further to assume that jurors who oppose the death penalty may be more favorable to the defense. Faced with this assumed dichotomy, when the respective challenges are granted, we are left with a middle class of jurors, who

---

[11] Because the issue of prosecution manipulation of the plea-bargaining process to achieve the outcome of trying Simpson before a death-qualified jury is nowhere to be found in this case, we obviously express no opinion on how or whether the outcome here might have been different had that issue been presented.

No. 09-30075

are supposedly impartial and fair. *See id.*[12] It was this "middle class" of jurors that convicted Simpson.

In the light of the foregoing, we hold that when one or more joint defendants face the death penalty at the time the jury is selected, death-qualification is constitutionally permissible, and we further hold that if all of the capital defendants plead guilty following voir dire, the trial court need not -- but of course may -- allow a new jury to be selected.[13]

## III.

We recap the opinion:   Eldridge Simpson appeals his conviction for narcotics-related offenses, murder, and attempted murder. Simpson says that

---

[12] Simpson identifies fifteen jurors that he says were removed because of their inability or unwillingness to administer the death penalty.   The government, at oral argument, countered -- and the record demonstrates -- that Simpson, working in tandem with his co-defendant Terrance Benjamin struck for cause at least sixteen prospective jurors who indicated that they were unwilling to substitute life imprisonment as an alternative to the death penalty.

[13] Simpson also argues, for the first time on appeal, that death-qualification is improper in federal prosecutions because Congress has not enacted authorizing legislation.   As this argument was not raised below, we consider it under the plain error prism. *United States v. Franco*, 632 F.3d 880, 884 (5th Cir. 2011).   Error is plain when it "is clear or obvious and . . . affects . . . substantial rights." *Id.*   If there is plain error, we have "the discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Id.*   The trial court did not err -- much less plainly err -- by removing for cause jurors that indicated an inability or absolute unwillingness to administer the death penalty. It merely followed the Supreme Court's admonition that "a  juror who in no case would vote for capital punishment, regardless of his or her instructions . . . *must* be removed for cause." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992) (emphasis added).

Finally, Simpson briefly raises two additional arguments which we summarize here; both are foreclosed by *Morgan*.   First, he says that because voir dire is the juror's first introduction to the case, the death-qualification process impermissibly taints the proceedings, but voir dire is the appropriate time to remove jurors "who in no case would vote for capital punishment . . . ." *See id.* at 728-29.   Simpson also argues that death-qualification violates jurors' due process rights to serve. *See Strauder v. West Virginia*, 100 U.S. 303, 310 (1880). This court has recognized, however, that only "qualified" jurors are entitled to serve. *Labat v. Bennett*, 365 F.2d 698, 711 (5th Cir. 1966).   A juror is not qualified if his death penalty "views would prevent or substantially impair the performance of his duties as a juror." *Morgan*, 504 U.S. at 728-29 (internal quotation marks and citation omitted).

he was not competent to stand trial, that substitute counsel should have been appointed to represent him, and that after his co-defendant Terrance Benjamin pleaded guilty, a new jury should have been selected. We have rejected all three arguments.

The trial court paid close attention to Simpson's competency; it held five hearings, and had him evaluated by two Federal Medical Centers. Four doctors indicated that Simpson was not mentally ill, as did the Federal Medical Center in Butner, North Carolina. On the basis of this well-developed record, we have held that the trial court did not err in finding Simpson competent to stand trial.

For similar reasons, we have held that Simpson was not entitled to the appointment of substitute counsel. Simpson, we hold, intentionally refused to cooperate with his able and diligent court-appointed lawyers, Sheila Myers and Julian Murray. Just as he was competent to stand trial, he was capable of cooperating with his lawyers, and he was given ample opportunity to communicate with them; he simply refused to do so. For this reason, we cannot find a Sixth Amendment violation, or any abuse of discretion, in the trial court's failure to appoint substitute counsel. We have also rejected Simpson's arguments that Michael Ciaccio's role as liaison counsel was unclear and that Ciaccio was really a servant of the district court. The record shows that the district court, in keeping with its careful management of this case, appointed Ciaccio to help Simpson communicate with Myers and Murray, that the district court adequately explained what Ciaccio's role was, and that the district court did not interfere with the attorney-client relationship.

Finally, Simpson insists that we should create a new rule limiting the use of death-qualified juries to cases in which one or more defendants face the death penalty at the time the jury is sworn. We have declined his invitation. Although Simpson was tried alone and was not facing the death penalty he was at the time of jury selection slated to be tried alongside Terrance Benjamin, who was

No. 09-30075

facing the death penalty, and the jury had already been selected at the time Benjamin entered his guilty plea. Moreover, Simpson does not allege that the jury instructions were deficient, and he has not rebutted the presumption that the jury properly applied its instructions.

Finding no reversible error, the judgment of the district court is, in all respects,

AFFIRMED.